IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| AMY KROEGER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 4:22-cv-00104 |
| vs. | |
| PROGRESSIVE UNIVERSAL INSURANCE COMPANY, | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| Defendant. | |

## I.      INTRODUCTION.

Iowa law recognizes that "market value" can be calculated in a variety of ways, all of which require subjective judgment calls. Here, Plaintiff Amy Kroeger seeks class certification by isolating and criticizing one aspect of the methodology used by Defendant Progressive Universal Insurance Company ("Progressive") to calculate the market value of total-loss vehicles under an insurance policy. Binding Eighth Circuit precedent does not permit the Court to certify a class in these circumstances because Progressive's use of the disputed portion of the methodology does not mean in any given case that the company did not calculate "market value." The Court therefore DENIES Kroeger's Motion for Class Certification.

## II.     FACTUAL AND PROCEDURAL BACKGROUND.

### A.  Kroeger's Allegations.

When a car is totaled in an accident, Progressive's form insurance policy (the "Policy") promises to pay the Actual Cash Value ("ACV") of the vehicle to the policyholder. The Policy states that ACV "is determined by the market value, age, and condition of the vehicle at the time the loss occurs." (ECF 1-1, p. 23.)[1] Progressive's "uniform policy" is to base total-loss appraisals on the valuation report of a third-party vendor, Mitchell International, Inc. ("Mitchell"). (ECF 49-3, pp. 42–44, 55–58, 67–70, 73–74.) After an adjuster inputs information, Mitchell's report is generated through the "Total-Loss Work Center." (Id.) At all relevant times, Progressive used

---

[1] All references to page numbers are to the auto-populated numbers placed on the top of each page by the electronic case filing system. This often will not match the page number at the bottom of the same page.

Total-Loss Work Center reports as the default method for calculating ACV. (Id., ECF 49-6, pp. 25–30.)

Plaintiff Amy Kroeger, acting individually and on behalf of a putative class of similarly situated individuals, alleges that Progressive's methodology for calculating ACV systematically understates the value of total-loss vehicles. She's okay with Progressive's starting point, which is identifying the price at which comparable vehicles either recently sold or, in the case of vehicles still on the market, are listed for sale. Kroeger complains, however, that Progressive makes a "Projected Sold Adjustment" to the list price for each unsold comparable vehicle. Progressive makes this adjustment for the ostensible purpose of reflecting the likelihood that the buyer will negotiate a reduction to the dealer's list price, but Kroeger argues that it is inappropriate and outdated because the Internet and sophisticated pricing tools have sharply reduced the willingness of car dealers to negotiate list prices. According to Kroeger, most dealers now list their bottom-line price as the "list price." By continuing to apply the Projected Sold Adjustment, Kroeger argues that Progressive is systematically undervaluing the ACV of total loss vehicles by an average of six-point-seven percent.

B.  *The Parties' Competing Expert Evidence.*

Before evaluating class certification, it is helpful to understand each side's expert evidence. Kroeger's industry expert, Kirk Felix, opines that Progressive's use of the Projected Sold Adjustment might have been appropriate many years ago when "it was fairly common in the used auto market for dealers to advertise vehicles at an above-market price and negotiate down from that price." (ECF 49-9, p. 4.) Now, however, Felix says consumers have far more "comparison tools" available, and thus "vehicles are priced to market and used car dealers do not deviate down from the advertised cash price, with limited exceptions that are not related to the market value of the car, but rather related to add-on products or how the transaction is structured or financed." (Id., pp. 3–4.) Felix criticizes Progressive's use of the Purchase Sold Adjustment as being "directly contrary to reality in the used auto market." (Id., p. 7.)

Felix admits there are situations where a used car will sell for less than list price. (Id., pp. 7–8.) He identifies a number of reasons for this: (i) the dealer is making concessions on price to shift profits to financing; (ii) the customer is purchasing ancillary products like extended warranties or service plans; (iii) the customer has a desirable trade-in vehicle; (iv) a special discount for friends/family/military, etc.; (v) rebates on service; or (vi) the customer identifies

2

defects in the vehicle that the dealer missed or occurred on the lot. (Id., pp. 8–9.) Felix's report states that "[a]ll of these reasons have nothing to do with the actual market price of a vehicle." (Id. at 9.) He admits, however, that there will be "rare" instances in which dealers negotiate off the list price. (Id., p. 12; ECF 61-12, p. 3.) He also admits that the "only way to know for sure what happened on any specific deal would be to pull the deal jacket on that car and take a look and see what happened." (ECF 61-11, p. 3.)

Progressive's industry expert, Marc Spizzirri, disagrees with Felix's opinion that negotiation from list price is "rare." He performed market research that included a sample of more than 600 used car dealers. (ECF 61-14, p. 18.) Seventy-six percent reported that they negotiate the sale price of used vehicles. (Id., p. 18.) Spizzirri also surveyed nineteen dealerships that use software from a company called vAuto, which Felix identifies as an industry leader. (Id.) Fifteen of these dealerships said they would negotiate without the consumer even needing to visit in person (i.e., by phone, email, or text). (Id., p. 19.) Only one of the nineteen dealers said it would not negotiate price at all. (Id.)

Turning to appraisal methodology, Kroeger's appraisal expert, Jason Merritt, opines that Mitchell's (i.e., Progressive's) methodology for valuing total-loss vehicles is generally "consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of ACV." (ECF 49-10, p. 5.) The only part Merritt says is improper is the Projected Sold Adjustment. (Id., p. 8.) Merritt says the Adjustment improperly deviates from the Internet price, which, in Merritt's view, is the only "hard" data point for the value of each comparable vehicle. (Id., pp. 6–8.) He further asserts that "appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for." (Id., p. 6.) According to Merritt, Mitchell could arrive at a "sound appraisal" by simply taking out the Projected Sold Adjustment for each comparable vehicle where such an Adjustment was applied and making corresponding adjustments. (Id., p. 8.) In Kroeger's case, this would have resulted in a market value of $7,782.72, in contrast to the $6,609.29 she and her lienholder actually received. (Id., pp. 9–10; ECF 61-1, p. 2; ECF 61-2, p. 2.)

As Merritt's Report acknowledges, Mitchell does not make a Projected Sold Adjustment for every comparable but unsold vehicle. (ECF 49-10, p. 9.) This is because some auto dealers "are known to be 'no haggle' dealers or equivocally 'one price' dealers, who do not practice negotiating on listing prices." (ECF 62-1, p. 33.) In Kroeger's case, Mitchell did not apply the Projected Sold

3

Adjustment to two of the thirteen vehicles identified as comparable to her total-loss vehicle. (ECF 49-10, p. 9.)

Progressive's experts provide additional detail about how the Projected Sold Adjustments are calculated and used. The process starts with J.D. Power, which gathers daily point-of-sale transaction data from a large network of dealerships. (ECF 62-2, pp. 3, 11; ECF 62-3, p. 5.) ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████

Kroeger and her experts object in several ways to J.D. Power's methodology. First, Kroeger characterizes J.D. Power's process as a "black box." (ECF 49-1, p. 12.) No one—not even Progressive—is entitled to know which dealerships are in the J.D. Power database (a/k/a the "Power Information Network"), much less evaluate whether those dealerships are representative of the used vehicle market generally. (Id.) Second, ████████████████████

██████████████████████████████████████████████████

██████████████████████ (Id., pp. 12–13.) ██████████████████

██████████████████████████████████████████████████

██████████████████████ Third, ████████████████████

██████████████████████████████████████████████████

██████████████████ A different Plaintiff-side expert, Jeffrey Martin, states that a substantial percentage—at least ten percent, and sometimes as high as sixty-seven percent, depending on the year—of vehicles were reported to the department of motor vehicles in the three states whose data

he evaluated (Ohio, Virginia, and Texas)[2] as having sold for more than list price. (ECF 49-12, pp. 8–15.) <u>Fourth</u>, although J.D. Power excludes sales at or above list price as "outliers," it makes no attempt to determine whether sales *below* list price were the result of something other than consumer negotiation, such as a discount for friends/family/military, purchase financing, or other reasons identified by Felix for why a sales price might be lower than list price. (ECF 49-1, pp. 13–14.) In other words, according to Kroeger's experts, J.D. Power (and, by extension, Mitchell and Progressive) is manipulating the methodology to drive down market value.

A different Progressive expert, Dr. Jonathan Walker, says the data does not support Kroeger's position. He analyzed hundreds of transactions in which both list and sold prices were available and concluded that the Projected Sold Adjustment used by Mitchell came within one percent, on the low side, of the vehicle's actual sold price. (ECF 62-4, ¶ 76.) In Walker's view, using Projected Sold Adjustments "was markedly more accurate on average [for calculating market value] than assuming that negotiation does not occur." (Id.) Kroeger credibly argues that there are problems with Walker's analysis, starting with the fact that he was evaluating the same J.D. Power dataset that systematically excluded vehicles where the sold price equaled or exceeded list price.

Regardless, Progressive takes issue in other ways with the methodology of Kroeger's experts, while also highlighting some of their admissions. For example, Progressive asserts that Martin relied on the taxable value of the reported sales in Ohio, Virginia, and Texas, which is not the same as sales price and instead includes ancillary dealer fees, warranties, service contracts, or accessories. (ECF 62, p. 11.) Progressive asserts that his methodology is therefore unreliable. (Id.) Even so, Progressive attaches significance to the fact that Martin concluded that somewhere between thirty-one and forty-four percent of vehicles sold for less than list price. (Id.)

Similarly, Progressive highlights Dr. Lacey's conclusion that more than half of all cars sold for less than list price in 2020 and 2021. (Id.) Dr. Lacey also admitted that it's "possible" a Progressive policyholder would benefit from Mitchell's approach to calculating Projected Sale Adjustment (ECF 62-5, p. 3); e.g., if Mitchell predicted, say, a five percent downward adjustment based on the difference between list and sales price but the consumer ended up successfully negotiating ten percent off the sales price. ████████████████████████████

---

[2] Kroeger alleges that Progressive's vendors did not save full transactional data, and thus Martin was forced to use DMV data. (ECF 49-1, p. 14.)

███████████████████████████████████████████████████ Dr.
Lacey admitted you would have to look at the "individual circumstance[s]" to know whether a
policyholder benefited from Mitchell's approach in any particular case. (ECF 62-5, p. 3.)

Finally, although Kroeger essentially proposes an across-the-board adjustment to
Progressive's ACV calculation, Progressive argues that Kroeger's own experts admit the market
changed substantially during the putative class period from 2012 to the present. (ECF 62, p. 13.)
For example, Felix described the post-pandemic market as "very unusual" and said there is
"constant change" in the used car market. (Id.) Dr. Lacey agreed that "pricing for the class in 2018
might be different in 2020." (Id.) Mitchell made changes to its methodology during this period,
too. (Id.)

### C.  Procedural History.

Kroeger filed her lawsuit as a putative class action in March 2022. (ECF 1.) She moved for
class certification in July 2023. (ECF 49.) Progressive resists. (ECF 61.) Substantial portions of
the parties' filings were made under seal, largely to protect information designated by J.D. Power
as confidential and proprietary. (E.g., ECF 62.) The Court will file two versions of this Order, one
public version with redactions, and a second under seal without redactions.

## III.   LEGAL ANALYSIS.

### A.  Class Certification Standards.

A party seeking class certification must first establish four prerequisites: "numerosity,
commonality, typicality, and adequacy." *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1155 (8th
Cir. 2017) (citing Fed. R. Civ. P. 23(a)). "Once those requirements are satisfied, the proposed class
must also fit within one of the three subsections of Rule 23(b)." *Id.* (internal quotation marks
omitted). Here, Kroeger seeks class certification pursuant to Rule 23(b)(3), which allows
certification if the Court "finds that the questions of law or fact common to class members
predominate over any questions affecting only individual members, and that a class action is
superior to other available methods for fairly and efficiently adjudicating the controversy." The
plaintiff bears the burden of proving that the requirements of Rule 23 are satisfied. *See Ebert v.
Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). District courts have discretion to determine
whether a class should be certified. *Webb*, 856 F.3d at 1155.

In resisting class certification, Progressive focuses primarily on commonality, predominance, adequacy, and superiority. The Court interprets this to mean Progressive is conceding that Kroeger has satisfied the other requirements. The Court will follow suit.

B. *The Court Denies Kroeger's Motion for Class Certification.*

Plaintiffs ask the Court to certify the following class:

> All persons who made a first-party claim on a policy of insurance issued by Progressive Universal Insurance Company to an Iowa resident where the claim was submitted from March 25, 2012, through the date an order granting class certification is entered, and Progressive determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

(ECF 49, p. 1.) The parameters for the Court's class certification decision are set by two relatively recent Eighth Circuit cases involving claims against insurance companies for improperly calculating ACV (albeit in the context of a homeowner's policy, not an automobile policy). *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371 (8th Cir. 2018); *In re State Farm Fire & Cas. Co. (LaBrier)*, 872 F.3d 567, 576 (8th Cir. 2017). In addition, the Court must consider the impact of a third Eighth Circuit case, *Smith v. Southern Farm Bureau Casualty Insurance Company*, which did not involve class certification but nonetheless addressed the merits of a claim almost identical to Kroeger's. 18 F.4th 976, 980–81 (8th Cir. 2021).

In *LaBrier*, which arose under Missouri law, the policy required State Farm to pay "actual cash value at the time of the loss of the damaged part of the property . . . not to exceed the cost to repair or replace the damaged part." *LaBrier*, 872 F.3d at 570. The policy did not define "actual cash value," but State Farm provided supplemental materials to policyholders stating that "actual cash value" would take into account, among other things, depreciation. *Id.* at 570–71. When calculating depreciation, State Farm allegedly breached the policy by including "labor depreciation," which resulted in policyholders receiving lower upfront cash payments than they otherwise would have. *Id.* at 571. The district court certified a class of similarly situated policyholders on breach of contract claims, but the Eighth Circuit reversed. *Id.* at 577. The Eighth Circuit held that State Farm used a "reasonable method" for estimating the depreciated value of the property at the time of loss and therefore did not breach the policy. *Id.* at 576. The Eighth Circuit left open the possibility that State Farm's methodology might "produce an unreasonable estimate of the actual cash value of some partial losses," but held that this was not an appropriate

7

question for class-wide adjudication because it "may only be determined based on all the facts surrounding a particular insured's partial loss." *Id.* at 577. "Thus, there are *no* predominant common facts at issue, and the decision certifying a class . . . must be reversed." *Id.*

In *Stuart*, which arose under Arkansas law, the Eighth Circuit addressed similar—but not identical—State Farm policy language. 910 F.3d at 373–74. The relevant difference from *LaBrier* was that the policy language in *Stuart* specified the method for calculating ACV payments as "the amount it would cost to repair or replace damaged property, less depreciation." *Id.* at 376. Although subtle, this was an important difference because the Arkansas Supreme Court had held in a relatively recent case that insurers could not depreciate the cost of labor when calculating ACV. *Id.* Thus, the policy in *Stuart*, when read in conjunction with Arkansas law, forced State Farm to calculate ACV in a particular way, which State Farm had not done. *Id.* The Eighth Circuit therefore held that the district court did not err in certifying a class. *Id.* at 377. Unlike *LaBrier*, "State Farm's obligation [in *Stuart*] was not merely to arrive at a 'reasonable' estimate of the property's value before and after the loss, but to calculate the ACV payment in accordance with the prescribed formula." *Id.* at 376. "There is no need for a jury to evaluate conflicting estimates based on different methodologies; the parties agreed on a methodology and the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." *Id.*

Read together, *Stuart* and *LaBrier* teach that the Court must start by reviewing Progressive's policy in conjunction with Iowa law to determine whether the policy requires a specific formula or methodology for calculating ACV. If so, *Stuart* controls and the class should be certified; if not, *LaBrier* controls and class certification must be denied. The crucial language in the Progressive policy is this: "The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." (ECF 1-1, p. 23.) The fighting issue is whether Progressive breached the requirement to consider "market value" when it used the Projected Sold Adjustment.

Iowa law defines "market value" as "the price a willing buyer under no compulsion to buy would pay and a willing seller under no compulsion to sell would accept." *Matter of Condemnation of Certain Rts. in Land for Extension of Armar Drive Project by City of Marion*, 974 N.W.2d 103, 111–12 (Iowa 2022) (quoting *Van Horn v. Iowa Pub. Serv. Co.*, 182 N.W.2d 365, 371 (Iowa 1970)); *see also, e.g.*, Iowa Code § 441.21(1)(*b*)(1) ("'*Market value*' is defined as the fair and

reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property.") The Iowa Supreme Court has wrestled for more than 100 years with how to measure the market value of damaged property for insurance purposes. *See, e.g.*, *Weaver v. Nat. Fire Ins. Co. of Hartford, Conn.*, 165 N.W. 223, 224–25 (Iowa 1917) (evaluating competing evidence on the market value of "pop corn" destroyed by fire); *Jones v. Auto. Ins. Co.*, 197 N.W. 448, 449 (Iowa 1924) (affirming jury verdict regarding market value of automobile destroyed in accident despite alleged deficiencies in plaintiff's evidence); *Britven v. Occidental Ins. Co., S. F., Cal.*, 13 N.W.2d 791, 793 (Iowa 1944) ("No hard and fast rule can be laid down by which the amount of such indemnity can be determined in all cases."). In one particularly recent case, the Iowa Supreme Court rejected a policyholder's argument that the insurer breached the policy by using a market approach, rather than a cost approach, to value a building destroyed by fire. *Luigi's, Inc. v. United Fire & Cas. Co.*, 959 N.W.2d 401, 408 (Iowa 2021). Collectively, these cases recognize what both Kroeger and Progressive appear to admit: determining market value is an art, not a science, and often requires subjective judgments. *See Naumann v. Iowa Prop. Assessment Appeal Bd.*, 791 N.W.2d 258, 262 (Iowa 2010) ("[V]aluation, for assessment purposes, is in the realm of opinion and there is no absolute standard. The methods, such as market comparables, used by assessors to determine the fair and reasonable market value necessarily involve some degree of subjectivity." (alteration in original) (internal punctuation and citation omitted)).

This Iowa Supreme Court precedent helps the Court in its evaluation of whether *Stuart* or *LaBrier* is controlling. Kroeger does not cite—and the Court was not able to locate—an Iowa case prohibiting insurers from including Projected Sold Adjustments when calculating ACV or market value. Thus, right off the bat, this case is not on all fours with *Stuart*, which was filed after the Arkansas Supreme Court had conclusively held that labor depreciation was not permitted when calculating ACV under a homeowner's policy. 910 F.3d at 376.

Nonetheless, Kroeger argues the case is not on all fours with *LaBrier*, either. *LaBrier* held that the plaintiff's claim failed on the merits under Missouri law before concluding the class should not have been certified. 872 F.3d at 576. Here, by contrast, the Court has not been asked to evaluate Kroeger's claim on the merits, nor would the Court have dismissed the case if asked to do so given the Eighth Circuit's reversal of the dismissal of a nearly-identical claim in *Smith*, 18 F.4th at 980–

9

81 (applying Arkansas law). In essence, Kroeger argues that because the Iowa Supreme Court plausibly might conclude that the application of the Projected Sold Adjustment is *per se* impermissible, there is a common issue that predominates in a way that makes the case more like *Stuart* than *LaBrier*. To analyze this argument, the Court must scratch beneath the surface of *Smith*, *Stuart*, and *LaBrier* alike to figure out which of *Stuart* or *LaBrier* is governing.

The Court concludes it is *LaBrier*. There, the Eighth Circuit focused heavily on the various ways depreciation might be estimated in the absence of a legal mandate for a particular methodology or formula. *See* 872 F.3d at 574 ("But unless the parties agreed to this estimate (or this method of estimating), a jury could reject that estimate based on other valuation evidence it found more probative."). With these various alternative methodologies in mind, the Eighth Circuit held that the plaintiff (and district court) erred in concluding "that the method State Farm uses to calculate replacement cost depreciation is a breach of contract *every time State Farm employs it*." *Id.* at 576. This was wrong, the Eighth Circuit explained, because State Farm reasonably could have used alternative valuation methodologies that would have resulted in lower payments to the policyholders. *Id.* Moreover, the payments to each policyholder were not final, but rather "subject to review by a jury in a lawsuit to determine the amount of her loss." *Id.* Only after individualized analysis "based on all the facts surrounding a particular insured's partial loss" could it be determined whether depreciating labor led to a breach of contract in any given case. *Id.* at 577.

*LaBrier* is governing because the use of the Projected Sold Adjustment does not *per se* mean every Progressive policyholder received less than market value for their total-loss vehicles. The Projected Sold Adjustment is only used for comparable vehicles that are listed on the market but have not yet sold; when a comparable vehicle has been sold, the sold price is used and, by definition, no Projected Sold Adjustment is applied. Moreover, as to the listed-but-not-yet-sold vehicles, the Projected Sold Adjustment is a *prediction*. Sometimes the actual sale price will end up higher than the Adjustment predicted, other times it will end up lower. This means, in turn, that Progressive's approach will result in a predicted market value that is too high in some cases and too low in others. It follows that Progressive's use of the Projected Sold Adjustment, standing alone, does not mean there has (or has not) been a breach in any particular case of Progressive's contractual duty to determine the vehicle's "market value" as part of calculating ACV. Instead, like *LaBrier*, the existence (or absence) of a breach cannot be determined until one analyzes "all the facts surrounding a particular insured's [total] loss." *Id.* at 577. Class certification is therefore

10

inappropriate and would be an abuse of discretion. *See id.*; *see also Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779–80 (8th Cir. 2013) (concluding district court abused discretion in certifying class because the court would have to determine whether there was a breach of contract on a case-by-case basis).

This conclusion is consistent with *Stuart*. In *Stuart*, State Farm applied a labor depreciation deduction that was categorically prohibited under Arkansas law. 910 F.3d at 376. Thus, there was an automatic breach of contract every time the deduction was applied: "all individuals who received an improperly-depreciated ACV payment suffered a legal injury—breach of contract— regardless of whether the ACV payment was more than, less than, or exactly the same as the ultimate cost of repairing or replacing their property." *Id.* at 377. In distinguishing *LaBrier*, *Stuart* recognized that the outcome would be different if the existence (or lack thereof) of a breach of contract could not be determined without additional analysis, as in the case of a contractual duty to provide a "reasonable" estimate of value. *Id.* at 376. "State Farm's obligation here was not merely to arrive at a 'reasonable' estimate of the property's value before and after the loss, but to calculate the ACV payment in accordance with the prescribed formula. There is no need for a jury to evaluate conflicting estimates based on different methodologies . . . ." *Id.*

Granted, Kroeger insists that she *is* arguing that Progressive has breached the policy across-the-board in the sense that the Projected Sold Adjustment reduced the "market value" calculation one hundred percent of the time that it is used. In her view, if a jury agrees with her position that the Projected Sold Adjustment results in something other than "market value," the class-wide remedy will be to recalculate the actual cash value payment without the Adjustment. No case-by-case analysis is necessary beyond simple math to determine what the Adjustment was in a particular case. She supports her position with *Smith*, which held that the plaintiff stated a plausible claim for breach of contract when he alleged that the insurer improperly applied the same type of Projected Sold Adjustment that is at issue here. *Id.* The Eighth Circuit concluded that if the plaintiff's allegations were true, "then Farm Bureau did *not* consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty, so Smith stated a claim for breach of contract based on the policy language." *Id.* at 981 (internal footnote omitted). Kroeger argues, in essence, that if the plaintiff in *Smith* stated a plausible claim for relief, so, too, has every putative class member here.

Curiously, although *Smith* was a putative class action, the district court did not certify the class before ruling on the merits of the named plaintiff's claim, nor did the court decide certification upon remand. *See* Docket, *Smith v. S. Farm Bur. Cas. Ins. Co.*, No. 4:20-CV-00707 (E.D. Ark. filed June 3, 2020). The Court therefore disagrees with Kroeger's suggestion that *Smith* sheds meaningful light on the class certification decision; instead, *LaBrier* and *Stuart* control the question. Read together, those two cases do not allow the legal question to be framed in the manner proposed by Kroeger in a situation where there is no required formula for how to calculate "market value" in Progressive's policy or under Iowa law. Instead, because Iowa law recognizes that the determination of market value "necessarily involve[s] some degree of subjectivity," *Naumann*, 791 N.W.2d at 262, the question of breach must be evaluated on a policyholder-by-policyholder basis. If Progressive's approach in any given case results in a market value that is too low, that policyholder will have a remedy, but it is impossible to say from that one policyholder's situation whether Progressive also breached its contractual obligations as to every other policyholder. The predominance requirement is not satisfied in these circumstances, and thus the motion for class certification must be denied. *See LaBrier*, 872 F.3d at 577.

Stated differently, because Iowa law recognizes that market value can be calculated in various ways, Progressive could have used alternative methodologies for valuing total-loss vehicles. It could, for example, have excluded listed-but-not-yet-sold vehicles from the equation altogether when determining market value. This would get rid of the Projected Sold Adjustment, but it would not necessarily help policyholders. Progressive also could have used a different database for comparable vehicles, looked further back (or not as far) when searching for comparable vehicles, or made any number of other methodological adjustments. With those alternatives in mind, the case is not amenable for class wide adjudication under Eighth Circuit precedent simply because Kroeger wants to isolate one of Progressive's many methodological decisions for evaluation. *See Stuart*, 910 F.3d at 376 (explaining that *LaBrier* reversed the class certification decision because "[d]ifferent methods may be used to estimate the fair market value of a property before and after a destructive event, and the policies at issue in *LaBrier* did not specify which should be used").

This conclusion is reinforced by the presence of other variables beyond methodology. For example, Kroeger's witnesses admit that the market changed significantly during the putative class period, which starts in 2012 and runs to the present day. Felix, the industry expert, described the

post-pandemic market as "very unusual." Dr. Lacey testified that "pricing for the class in 2018 might be different in 2020." It follows that the use of the Projected Sold Adjustment might have contributed to something other than "market value" being used during some periods (such as 2021 and 2022, when used car prices appear to have been higher across the board) but not others. Given this variation, the resolution of one claim brought by one policyholder (Kroeger) will not shed light on—much less conclusively answer—the breach of contract question for all other class policyholders. *See Halvorson*, 718 F.3d at 780; *see also Lara v. First Nat'l Ins. Co. of Am.*, 25 F. 4th 1134, 1140 (9th Cir. 2022) (affirming denial of class certification in case involving ACV calculation under automobile policy because of potential variation in each policyholder's situation).

The point is perhaps best illustrated by considering how the jury would be instructed if Kroeger's claims went to trial. In Kroeger's view, the jury should be asked whether Progressive breached the Policy by using the Projected Sold Adjustment. This is not, however, the primary question. In the Court's view, the jury would have to be asked, in the first instance, *whether Progressive failed to pay ACV as determined by the market value, age, and condition of the vehicle at the time the loss occurs.* The use of the Projected Sold Adjustment is unquestionably one of the factors the jury would be able to consider, but it is not the *only* factor.

Moreover, even if the Court used special interrogatories to try to isolate the impact of the Projected Sold Adjustment on whether Progressive breached the contract, the jury's answer could not be translated in a meaningful way to the remainder of the class. Suppose, for example, the jury was asked: "Did Progressive's use of the Projected Sold Adjustment cause the market value of Kroeger's vehicle to be too low?" Suppose further the jury answered "yes," but then awarded Kroeger only $200 in damages, instead of the $1,173.43 she is seeking.[3] This could mean:

(i)     Progressive's use of the Projected Sold Adjustment is always a breach but only understates the market value of total-loss vehicles by 17.04% the total amount of the Adjustment (i.e., $200 divided by $1,173.43);

(ii)    Progressive's use of the Projected Sold Adjustment is only a breach if the discrepancy between the market value calculation with and without the Adjustment is $973.43 or more (i.e., $1,173.43 minus $200.00), but otherwise is not a breach;

---

[3] Kroeger alleges that, without the Projected Sold Adjustment, the market value of her vehicle would have been $7,782.72, in contrast to the $6,609.29 she and her lienholder received. $7,782.72 minus $6,609.29 equals $1,173.43.

(iii)    Progressive's use of the Projected Sold Adjustment is only a breach if the discrepancy between the market value calculation with and without the adjustment is 12.51% percent or more of the total value of the vehicle as calculated without the adjustment (i.e., $973.43 divided by $7,782.72), but otherwise is not a breach;

(iv)    Progressive's use of the Projected Sold Adjustment was only a breach because of the unique facts surrounding Kroeger's claim, such as the unusually large number of comparable vehicles (thirteen) used to determine market value and the portion of those comparable vehicles (eleven out of thirteen, or 84.62%) for which the Projected Sold Adjustment was applied;

(v)    Progressive's use of the Projected Sold Adjustment was a breach based on market conditions in 2018 (when Kroeger suffered her total-loss), but otherwise is not necessarily a breach; or

(vi)    Some combination of (i) through (v).

There would be no way to know which of these conclusions the jury reached. Indeed, even if the jury said "no" to whether Progressive's use of the Projected Sold Adjustment caused the market value of Kroeger's vehicle to be too low, it would be impossible to translate that answer to the rest of the class. The "no" answer might mean the Projected Sold Adjustment can *never* constitute a breach of contract, or it might simply mean that the use of the Adjustment was not a breach in the unique circumstances of Kroeger's claim. *See LaBrier*, 872 F.3d at 577 (recognizing that the labor depreciation deduction might have caused some policyholders but not others to receive an unreasonable estimate of actual cash value). Likewise if the jury said "yes" and awarded every dollar sought by Kroeger. This would confirm the breach in her individual case, but there would be no way of knowing whether it meant there had been a breach as to every other policyholder as well. *See id.*

The bottom line is that in the absence of a "prescribed formula" for calculating ACV, there are too many variables in the market value analysis to make class certification appropriate under *LaBrier* and *Stuart*. Or, to state it differently, class certification will not "generate common answers" apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, individual issues predominate and class wide treatment is not superior. *See Stuart*, 910 F.3d at 376; *LaBrier*, 872 F.3d at 577. The Court understands that this ruling is at odds with district court decisions in other places on claims nearly identical to those brought by Kroeger. *See Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 22-CV-02482, 2023 WL 7213796, at *14 (W.D. Tenn. Aug. 25, 2023); *Drummond v. Progressive Spec. Ins. Co.*, No. CV 21-4479, 2023 WL 5181596, at *10 (E.D. Pa. Aug. 11, 2023); *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-

CV-175, 2023 WL 7219499, at *9 (N.D. Ga. Aug. 3, 2023); *Volino v. Progressive Cas. Ins. Co.*, No. 21 CIV. 6243, 2023 WL 2532836, at *9 (S.D.N.Y. Mar. 16, 2023). None of these courts are in the Eighth Circuit, and thus they are not bound by *LaBrier* and *Stuart*.

## IV.    CONCLUSION.

The Court DENIES Kroeger's Motion for Class Certification. (ECF 49.)


**IT IS SO ORDERED.**


Dated: November 20, 2023                      _____
                                              STEPHEN H. LOCHER
                                              U.S. DISTRICT JUDGE